UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
BOARD OF EDUCATION OF THE NORTH  :
ROCKLAND CENTRAL SCHOOL   :
DISTRICT,          :   **OPINION AND ORDER**
       Plaintiff,   :
            :   16 CV 3924 (VB)
v.            :
            :
C.M., individually and on behalf of her child, :
P.G.,           :
       Defendants.  :
------------------------------------------------------------x

Briccetti, J.:

   Plaintiff Board of Education of the North Rockland Central School District (the

"District"), brings this action pursuant to the Individuals with Disabilities Education Act, 20

U.S.C. § 1400, et seq. ("IDEA"), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §

794 ("Section 504").  The District seeks reversal of the portion of the decision of an impartial

hearing officer ("IHO") that found the District had violated Section 504 and granted relief to

C.M., the parent of a child with disabilities, P.G. ("Parent").  Parent seeks to have the IHO's

decision affirmed or, in the alternative, to have the State Review Officer's ("SRO") dismissal of

Parent's IDEA claims reversed.

   Now pending are the parties' cross-motions for summary judgment.  (Docs. ##46, 55).

   For the reasons set forth below, the District's motion is GRANTED and Parent's motion

is DENIED.

   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

**BACKGROUND**

I.     Statutory Framework

       A.     IDEA

       The IDEA was enacted to promote the education of disabled children.  20 U.S.C.

§ 1400(d)(1)(A); see Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S.

176, 179 (1982) (interpreting predecessor statute to IDEA).  States receiving public funds are

required to provide a free appropriate public education ("FAPE") to children with disabilities.

20 U.S.C. § 1412(a)(1)(A).  Public school districts must provide "'special education and related

services' tailored to meet the unique needs of a particular child, [which are] 'reasonably

calculated to enable the child to receive educational benefits.'"  Walczak v. Fla. Union Free Sch.

Dist., 142 F.3d 119, 122 (2d Cir. 1998) (quoting Bd. of Educ. of the Hendrick Hudson Cent. Sch.

Dist. v. Rowley, 458 U.S. at 207).

       States have an obligation under the IDEA to identify, locate, and evaluate "[a]ll children

with disabilities residing in the State" to determine whether they require special education and

related services.  20 U.S.C. § 1412(a)(3)(A); see Handberry v. Thompson, 446 F.3d 335, 347 (2d

Cir. 2006).  This so-called "child find" obligation extends to children who are "suspected of

being a child with a disability."  34 C.F.R. § 300.111(c)(1).

       The IDEA requires states to create an individualized education program ("IEP") for each

disabled student.  See 20 U.S.C. § 1412(a)(4); see also Frank G. v. Bd. of Educ. of Hyde Park,

459 F.3d 356, 363 (2d Cir. 2006) ("The key element of the IDEA is the development of an IEP

for each handicapped child.").  The IEP is a "comprehensive statement of the educational needs

of a handicapped child and the specially designed instruction and related services to be employed

to meet those needs."  Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 368 (1985).

If the state fails to provide a FAPE to a disabled child, the parents may enroll the child in a private school and seek reimbursement for the cost of the private school from the local board of education.  See 20 U.S.C. § 1412(a)(10)(C); Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. at 369-70, 374.

In New York, parents seeking such reimbursement must first file a "due process" complaint challenging the appropriateness of the IEP.  FB v. N.Y.C. Dep't of Educ., 923 F. Supp. 2d 570, 577 (S.D.N.Y. 2013).  An IHO conducts a hearing on the parents' complaint.  See N.Y. Educ. Law § 4404(1).  A board of education is required to reimburse parents for private educational services if: (i) the board fails to establish the student's IEP provided a FAPE; (ii) the parents establish their unilateral placement was appropriate; and (iii) equitable considerations favor the parents' claim.  See Florence Cty. Sch. Dist. Four v. Carter, 510 U.S. 7 (1993); M.W. ex rel. S.W. v. New York City Dep't of Educ., 725 F.3d 131, 135 (2d Cir. 2013).  The IHO's decision may be appealed to an SRO at the New York State Education Department.  See N.Y. Educ. Law § 4404(2); see also 20 U.S.C. § 1415(g).  The SRO's decision may be challenged in federal court.  See 20 U.S.C. § 1415(i)(2)(A).

B.    Section 504

Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

"In the educational context, Section 504 imposes requirements on schools that are parallel to the IDEA requirements."  K.H. v. N.Y. City Dep't of Educ., 2014 WL 3866430, at *3 (E.D.N.Y. Aug. 6, 2014).  "However, the two statutes provide different protections, because 'Section 504 provides relief from discrimination, whereas the IDEA provides relief from

inappropriate educational placement decisions, regardless of discrimination.'" Id. (quoting

Wenger v. Canastota Cent. Sch. Dist., 979 F.Supp. 147, 152 (N.D.N.Y. 1997), aff'd, 208 F.3d

204 (2d Cir. 2000)).  As a result, to establish liability under Section 504, "courts have held that a

plaintiff must demonstrate more than an incorrect evaluation or substantively faulty IEP."  R.B.

ex rel. L.B. v. Bd. of Educ., 99 F. Supp. 2d 411, 419 (S.D.N.Y. 2000).  Rather, "there must be

evidence that a school district acted with deliberate or reckless indifference to the student's

federally protected rights or with bad faith or gross misjudgment."  Schreiber v. E. Ramapo Cent.

Sch. Dist., 700 F. Supp. 2d 529, 564 (S.D.N.Y. 2010) (internal quotation marks omitted).

II.     Factual Background

        The parties have submitted briefs, statements of material facts pursuant to Local Civil

Rule 56.1, and the record and exhibits from the proceedings below, which reflect the following

factual background.

        P.G. was born in Novosibirsk, Russia in 1995.  According to his medical records, his

birth parents were alcoholics.  Beginning when he was three years old, P.G. lived in orphanages

in Russia, where he was abused, both physically and sexually.  Parent and her now deceased

husband adopted P.G. in 2003, when he was eight years old, and brought him to the United

States.  In May 2003, P.G. was diagnosed with prenatal hypotrophy (muscle weakness), perinatal

encephalopathy (brain damage of unknown origin), delay in psychological development, and

dysarthria (speech impairment).  (Parent Ex. C).

        As detailed below, P.G. has a long history of behavioral issues, in addition to

developmental disabilities.

        A.      First Through Fifth Grades

        P.G. was enrolled in the District on May 9, 2003, entering in the first grade.  From the

first through fourth grades, i.e., the 2003-2004 through 2006-2007 school years, PG attended

Stony Point Elementary School.  Initially the District placed him in general education classes with English as a Second Language ("ESL") services.  The District first referred P.G. for special education services on October 8, 2004.  Some of the District documents and evaluations from this time and later have an incorrect birth date for P.G., which suggested he was two years younger than his actual age.  As a result, some of the evaluations of P.G. likely overstated his abilities.  Nevertheless, evaluations showed P.G. was functioning well below grade-level in math and reading, had a very low IQ, and had attention deficits, among other issues.

On December 16, 2004, the District classified P.G. as a student with an "Other Health Impairment."  (Dist. Ex. 164).  He was recommended for consultant teacher services for English language arts and math, a modified curriculum, and a behavior intervention plan.

In April 2005, the District's Committee on Special Education ("CSE") recommended a 15:1 student-teacher-ratio class in the third grade for P.G. for all core subjects, in addition to counseling once per week.

In April 2006, the CSE made the same recommendations for P.G.'s fourth grade, but added a self-contained reading class.

For the fifth grade, i.e., the 2007-2008 school year, P.G. attended Farley Middle School, where he was placed in a self-contained program for all core classes.  This is when "things began to unravel for P.G."  (Parent SOF ¶ 97).  "He became frustrated with the other students, the teacher and the work."  (Id.).  In addition, his "behavior issues grew worse and he would often run away and hide in school."  (Id. ¶ 99).  He was also performing "significantly below grade level in all academic areas."  (Dist. SOF ¶ 128).

A reevaluation from February 2008 showed P.G. was still performing academically at a very low level and had significant cognitive difficulties. Nevertheless, he remained classified as "other health impaired," rather than developmentally or learning disabled. (See Dist. Ex. 97).

B.    BOCES Programs – Repeated Fifth Grade and Sixth Grade

On March 10, 2008, the District held a CSE meeting for P.G.'s sixth grade, i.e., the 2008-2009 school year. The IEP notes P.G.'s significant needs and low cognitive function. On June 11, 2008, P.G. was suspended from school for hitting two students unprovoked. A June 17, 2008, IEP recommended placement in an "8:1+1" (student to teacher plus special education teacher ratio) program for students with emotional and behavioral difficulties at a Board of Cooperative Educational Services ("BOCES") in-District program at Haverstraw Middle School ("BOCES Haverstraw"). (Dist. Ex. 97). In January 2009, the District amended P.G.'s IEP to reflect that he was repeating the fifth grade during this school year.

In March 2009, P.G. jumped out of a second story window and suffered injuries. He was taken to a psychiatric center for children, where he remained for several weeks. While hospitalized, P.G. underwent a neuropsychological exam, which confirmed both his 1995 birth date and his severe academic delays and language deficiencies, in addition to other diagnoses, including "Pervasive Developmental Disorder, Not Otherwise Specified," "Rule Out Post Traumatic Stress Disorder" ("PTSD"), and "Mild Mental Retardation." (Dist. Ex. 75).

On April 30, 2009, the CSE conducted a review of P.G.'s placement and determined that he should continue at BOCES Haverstraw, in an 8:1+1 class, with counseling services. In addition, the CSE added a 1:1 aide. On May 18, 2009, the CSE reconvened and added speech language services to the IEP.

P.G. started the sixth grade, i.e., the 2009-2010 school year, at BOCES Haverstraw.  On September 23, 2009, P.G. was suspended from school for fighting.  One month later, he was arrested for breaking and entering.

In an academic and counseling report dated November 9, 2009, BOCES detailed P.G.'s areas of progress and strengths, but noted that "there has been some regression as of late." (Dist. Ex. 58).  The report further documented that P.G. continued to read at a third grade level, and "has tremendous difficulty handling problematic situations," including because he would "verbally assault students and staff" when angry or frustrated.  (Id.).

On November 23, 2009, the CSE recommended placement at Rockland BOCES Hilltop School.  (Parent SOF ¶ 185).  According to Parent, BOCES Hilltop is "exclusively for children with emotional and behavioral difficulties."  (Parent Response to Dist. SOF ¶ 180).  At this time P.G. was "nearly 15 years old, enrolled in the sixth grade, yet working on a third grade academic level."  (Id.).  At BOCES Hilltop, P.G. maintained the 1:1 aide, was still in an 8:1+1 class, and was still "in the general educational curriculum including all assessments."  (Parent SOF ¶ 186).

C.    Seventh Grade

On May 3, 2010, the CSE met again and recommended that P.G. stay at BOCES Hilltop for the seventh grade, i.e., the 2010-2011 school year.

On August 10, 2010, P.G. was suspended from school for "assault."  (Dist. Ex. 42).

In February 2011, P.G. sustained a concussion on the bus to school.

In March 2011, an evaluation of P.G. determined that his IQ and overall intellectual functioning were in the "extremely low" range, and that his "total level of achievement" and "academic achievement" were "very low."  (Dist. Ex. 30).

On or about April 15, 2011, Parent received an anonymous letter which stated that P.G. was being bullied on the school bus.

On May 2, 2011, the CSE discontinued P.G.'s 1:1 aide because it was "no longer necessary." (Dist. Ex. 27).

On May 11, 2011, Parent requested an emergency CSE meeting because she was "concerned both for his safety and his lack of progress in the 7th grade." (Dist. Ex. 26).

By letter dated May 23, 2011, Judith Myerson, P.G.'s privately-retained psychotherapist, diagnosed P.G. with PTSD, mild mental retardation, and alcohol-related neurodevelopmental disorders, among other things. She opined that P.G.'s "current school placement exacerbates his anxiety, PTSD and dysregulation," and she recommended a residential placement for P.G. (Dist. Ex. 25).

The CSE convened on May 24, 2011. Parent attended the meeting with a "student advocate," Ralph Antonelli, who "direct[s] the admissions and referrals at the the Judge Rotenberg Center," a special education school located in Massachusetts. (Dist. Ex. 24; Tr. at 1149). At the CSE meeting, Parent requested a residential placement for P.G. The CSE denied that request, again recommending BOCES Hilltop instead.

Mr. Antonelli testified he told the CSE that P.G. "had not made progress," which was "clearly indicated" in "all the documents [he and Parent] had available to" them. (Tr. at 1169). He testified they also discussed at the meeting P.G.'s "social and emotional needs," particularly that they "were not being met," and that the district was "not addressing nor did they have the ability to address" P.G.'s "abuse issues" including issues related to sexual abuse. (Tr. at 1169-70). Mr. Antonelli testified the CSE chairperson's response to Parent's request for a residential placement was to "state[] clearly that the school district would never recommend residential

placement, that they didn't feel it was appropriate and that they felt his program was appropriate." (Id. at 1170-01).

Parent received the resulting IEP on or about June 17, 2011. (See Dist. Ex. 23).

Parent subsequently provided the District with a psychiatric assessment dated June 16, 2011, by Dr. Edward Hall, a psychiatrist who treated P.G. Dr. Hall's report states, "[e]ducationally [P.G.] has been classified for Special Education Placement under Other Health Impaired yet has evidence of learning disabilities." (Parent Ex. H). Dr. Hall's assessment further states P.G.'s history "places [him] at grave risk for serious harm to himself, antisocial behavior, and impairments in social relations." (Id.). It recommends "residential placement," among other things. (Parent Ex. H). The District apparently did not respond to this information. (Parent SOF ¶ 229).

By letter dated June 21, 2011, the Stony Point Police Department Youth Bureau identified P.G. as an "at risk youth, who should be under 24-hour supervision," and noted it had "had numerous contacts with him." (Dist. Ex. 22).

D.    Eighth Grade

Parent enrolled P.G. at the BOCES Hilltop program again for the eighth grade, i.e., the 2011-2012 school year.

On January 13, 2012, BOCES Hilltop issued a "Regression Statement," which documented that it took several weeks for P.G. to "re-establish his skills" after he returned from vacation. (Dist. Ex. 13).

A "Vocational Assessment Report" dated January 16, 2012, notes P.G. continued to read at a second or third grade level in the eighth grade. (Dist. Ex. 12).

In a psychological assessment dated January 26, 2012, Ms. Myerson, P.G.'s psychotherapist, highlighted P.G.'s difficulties and again recommended residential placement. (Dist. Ex. 9).

By report dated February 8, 2012, the BOCES Hilltop staff changed P.G.'s track to an "alternative assessment" track and recommended "modifications to [P.G.'s] academic long-term planning," noting, among other things, that "the increased academic demands are beginning to exceed [P.G.'s] cognitive abilities." (Dist. Ex. 7). The report also states that P.G.'s "academic placement will continue to require a high level of supervision, structure and support to meet his social, emotional, behavioral and learning needs." (Id.).

On February 9, 2012, the CSE met to plan for the 2012-2013 school year. The CSE considered the BOCES report during this meeting. The CSE also considered Ms. Myerson's assessment.

The CSE again refused Parent's request for a residential placement and instead recommended placement at BOCES River View High School, where P.G. would be placed in a program for students with emotional disabilities for the 2012-2013 school year. (Dist. Ex. 6). Ms. Myerson testified she did not think this was an appropriate placement because P.G. was "developmentally disabled," which was not the "focus" of Riverview. (Tr. at 960).

P.G.'s adoptive father died in the spring of 2012. Parent alleges this exacerbated his behavioral issues. At one point, P.G. disappeared for hours and was eventually found "wrapped in a blue plastic tarp" in a wood pile in his back yard. (Tr. at 1604). P.G. also acted in a sexually inappropriate manner toward Parent. In April 2012, Parent, with the help of a BOCES staff member, tried to have P.G. hospitalized at a mental health facility, but he could not be admitted.

Parent testified that she tried to contact the District several times during this period, but the District never returned her calls.

On or about June 11, 2012, Parent contacted a special education attorney.

In August or September 2012, Parent removed P.G. from the District and placed him in a group home for individuals with developmental disabilities located in the neighboring Clarkstown Central School District ("Clarkstown"). Ms. Myerson testified she did not believe this was an appropriate placement for P.G. but "it was a better situation than him being at home . . . [b]ecause there was a 24 hour staff available to keep an eye on him." (Tr. at 965-66).

As a result of this placement in Clarkstown, P.G. was not under the District's purview for the remainder of the 2012-2013 academic school year, or for any years thereafter.

E.     Enrollment at the Whitney Academy

While enrolled at Clarkstown, P.G. was arrested on two occasions and spent several months in jail, from January-April and September-December 2014.

In November 2014, Parent brought a due process complaint against Clarkstown for the 2012-2013, 2013-2014, and 2014-2015 school years. At a CSE meeting on January 8, 2015, Clarkstown agreed that P.G. should be placed at the Whitney Academy for the remainder of the 2014-2015 and the 2015-2016 school years. The Whitney Academy "specializes in the treatment of dually diagnosed (developmentally delayed and psychiatrically disordered) young men, ages ten to twenty-two, who present with a wide spectrum of behavior problems." (Parent SOF ¶ 292, citing Parent Exs. CC and DD).

Ms. Myerson testified she "believe[s] that [P.G. is] where he should be." (Tr. at 972). She testified the Whitney Academy "ha[s] a trauma focus . . . [and] a focus on sexual behaviors, .

. . [and] a very structured program and supervision." (Id.). In addition, students at Whitney "have to have some form of developmental disability to be there." (Id.).

P.G. "aged out of special education services on June 30, 2016." (Parent SOF ¶ 2).

II.    Procedural Background

Parent filed a due process complaint against the District on January 9, 2015, alleging violations of the IDEA and Section 504, among other things. In particular, Parent alleged the District failed to provide P.G. with a FAPE for the 2005-2006 through 2011-2012 school years. In addition, Parent alleged the District "egregiously misunderst[ood] and neglect[ed] . . . PG's needs," causing P.G. a "gross denial" of a FAPE. (Due Process Complaint ¶ 60). On January 20, 2015, the District responded to the due process complaint. It submitted an amended response on consent on February 25, 2015.

The IHO held a hearing over eleven non-consecutive days between May 26, 2015, and October 19, 2015. By decision dated January 27, 2016, the IHO dismissed Parent's IDEA claims on the ground that they were time-barred, but found the District had violated Section 504 with respect to its actions between January and June 2012. The IHO "concluded that the appropriate remedy for the District's violations of the Student's rights under Section 504 is funding for an additional year at the Whitney Academy" (IHO at 32); i.e., for the 2016-2017 school year.

Parent and the District timely filed cross-appeals with the SRO. By decision dated May 2, 2016, the SRO affirmed the portion of the IHO's decision dismissing Parent's claims under the IDEA as time-barred, and found it lacked jurisdiction over the Section 504 claims. The SRO therefore denied both appeals.

The District initiated this action on May 26, 2016. On June 23, 2016, because the District had refused to comply with the IHO's January 27, 2016, remedy order, Parent moved for a

preliminary injunction and temporary restraining order to enforce the IHO's award of an additional year's tuition at the Whitney Academy and continuation of related services during the pendency of this action. (Doc. #11). On July 21, 2016, the Court heard oral argument on the motion and, by Order dated July 25, 2016, the Court granted plaintiff's motion for the reasons stated on the record at the July 21 hearing. (Docs. #38).

## DISCUSSION

I.    Standard of Review

In federal court, parties seeking review of administrative decisions in cases brought under the IDEA usually do so by motion for summary judgment. See Viola v. Arlington Cent. Sch. Dist., 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006). However, unlike in an ordinary summary judgment motion, the existence of a disputed issue of material fact will not necessarily defeat the motion. Id. Rather, summary judgment in the IDEA context functions as an appeal from an administrative decision. T.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 252 (2d Cir. 2009).

In this context, the Court (i) reviews the record of the administrative proceedings; (ii) hears additional evidence at the request of a party; and (iii) grants such relief as it deems appropriate based on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C).

"Although the district court must engage in an independent review of the administrative record and make a determination based on a 'preponderance of the evidence,' . . . such review 'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'" Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112–13 (2d Cir. 2007) (quoting Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 (2d Cir. 1997) and Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458

U.S. 176, 206 (1982)).  "To the contrary, federal courts reviewing administrative decisions must give 'due weight' to these proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'"  Id. (quoting Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. at 206, 208).  Indeed, "the district court's determination of the persuasiveness of an administrative finding must also be colored by an acute awareness of institutional competence and role."  M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 244 (2d Cir. 2012).

"However, the district court is not required to defer to administrative determinations regarding matters of law."  K.H. v. N.Y.C. Dep't of Educ., 2014 WL 3866430, at *15 (E.D.N.Y. Aug. 6, 2014).

II.      Accrual of Section 504 Claim

The District argues Parent's Section 504 claim is time-barred.

The Court agrees.

Claims brought under Section 504 are governed by a three-year statute of limitations. Morse v. Univ. of Vt., 973 F.2d 122, 127 (2d Cir. 1992).

The statute of limitations for Section 504 claims accrues "when [plaintiff] knew or had reason to know of the injury serving as the basis for his claim."  Harris v. City of N.Y., 186 F.3d 243, 247 (2d Cir. 1999).

"In analyzing the timing of accrual in the context of discrimination claims, the Supreme Court has instructed that "the proper focus is on the time of the discriminatory act, not the point at which the consequences of the act become painful."  Morse v. Univ. of Vermont, 973 F.2d at 125 (quoting Chardon v. Fernandez, 454 U.S. 6, 8 (1981)).

"Thus, in analyzing Plaintiffs' Section 504 . . . claim[], the Court measures timeliness from the date Plaintiff received notice of Defendants' allegedly adverse actions." Pape v. Bd. of Educ. of the Wappingers Cent. Sch. Dist., 2009 WL 3151200, at *9 (S.D.N.Y. Sept. 29, 2009) (citing Morse v. Univ. of Vermont, 973 F.2d at 125).

Determining when a parent knew or should have known of the discriminatory act "is necessarily a fact-specific inquiry." K.H. v. N.Y.C. Dep't of Educ., 2014 WL 3866430, at *16.

Here, Parent's due process complaint alleges the District violated Section 504 "by failing to provide an appropriate residential placement and appropriate support and services." (Due Process Complaint ¶ 60).

The record makes clear Parent knew of this allegedly discriminatory failure by no later than May-June 2011.

In particular, by March 2011, if not earlier, Parent knew P.G. had an "extremely low" range IQ and overall intellectual functioning, and yet the District had only classified him as "other health impaired." (Dist. Ex. 30). In May 2011, P.G.'s private psychotherapist diagnosed P.G. with mild mental retardation and alcohol-related neurodevelopmental disorders, among other things, and opined that P.G.'s school placement was inappropriate for his needs. She also advised that P.G. should be placed in a residential program instead. Parent participated in the May 24, 2011, CSE meeting with the assistance of an advocate not affiliated with the District. Parent and the advocate raised their concerns about P.G.'s lack of progress and requested a residential placement for P.G. In addition, Dr. Hall's June 16, 2011, psychiatric assessment explicitly states P.G. was improperly classified as "other health impaired" rather than as developmentally or learning disabled. It also recommends a residential placement.

Despite all of this information, the District did not change P.G.'s classification and it denied Parent's request for a residential placement for the 2011-2012 school year. Parent knew of the District's decisions in this regard at the May 24, 2011, CSE meeting, and they were confirmed on or about June 17, 2011, when she received the resulting IEP.[1] (Dist. Exs. 23, 24).

Accordingly, Parent knew or should have known of the District's allegedly discriminatory acts by no later than June 2011. And since Parent's due process complaint against the District was not filed until January 9, 2015, more than three years after the Section 504 claim accrued, the Section 504 claim is time-barred.

The Court respectfully disagrees with the IHO's conclusions to the contrary. The IHO found Parent's Section 504 claim was timely because "from January 2012 through June 2012," the District "denied the Student a FAPE under Section 504 by failing to provide the Student a residential placement." (IHO at 31). The IHO concluded "the District's failure to remove the Student from BOCES Hilltop between January and June of 2012 was a 'gross misjudgment.'" (IHO at 32). However, the IHO did not address the fact that Parent already <u>knew</u> about the District's decision to reject Parent's request for a residential placement, and its recommendation instead for placement at BOCES Hilltop for the 2011-2012 school year, by no later than June

---

[1]     The Court notes that the 2012-2013 school year—and therefore the February 9, 2012, CSE meeting and resulting IEP—are not the basis for any claims before this Court. The due process complaint seeks relief for the 2005-2006 through 2011-2012 school years only. (Due Process Compl. "Proposed Resolution" ¶¶ B, C). Moreover, Parent's decision to limit her claims against the District up to and including the 2011-2012 school year appears intentional: Parent brought a separate due process complaint against the Clarkstown School District for the 2012-2013 through 2014-2015 school years. (Dist. Ex. 256). Because Parent does not seek relief from the District for the 2012-2013 school year, the February 9, 2012, CSE meeting and resulting IEP—which addressed recommendations for "School Year: 2012-2013"—cannot be the basis for Parent's claims here. (Doc. #6).

2011.  Therefore, the IHO committed legal error when it concluded Parent's Section 504 claim was not barred by the applicable statute of limitations.

III.    Parent's IDEA Claim

Parent argues her IDEA claim is still timely, and in the alternative, the statute of limitations should be tolled because the District made specific misrepresentations to Parent and the District withheld information from Parent.  (Parent Br. at 21-23).

The Court disagrees.

Under the IDEA, parents must request an impartial due process hearing "within 2 years of the date the parent . . . knew or should have known about the alleged action that forms the basis of the complaint."  20 U.S.C. § 1415(f)(3)(C).

However, a claim will not be considered time-barred if "the parent was prevented from requesting the hearing due to (i) specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint; or (ii) the local educational agency's withholding of information from the parent" that is required to be provided under the IDEA. 20 U.S.C. § 1415(f)(3)(D).

A.    Timeliness

For the same reasons provided with respect to Parent's Section 504 claim, supra, Parent knew or should have known about the acts that formed the basis of her complaint—namely, that P.G. was allegedly denied a FAPE for the 2005-2006 through 2011-2012 school years—no later than June 2011.  Nevertheless, Parent did not bring her due process complaint until January 2015, well beyond the two-year statute of limitations for IDEA claims.

Accordingly, Parent's IDEA claims with respect to the 2005-2006 through 2011-2012 school years are untimely.

B.    Specific Misrepresentation Exception

Parent argues the District misrepresented P.G.'s "level of functioning, progress and behaviors," and the SRO erred when it determined that these misrepresentations did not warrant the application of the IDEA's "specific misrepresentation" exception to the statute of limitations. (Parent Br. at 21).

The Court disagrees.

The SRO correctly determined "the hearing record does not support a conclusion that the district prevented the parent from filing a due process complaint notice due to an intentional or knowing deception." (SRO at 19). Moreover, any alleged misrepresentations by the District had become known to the Parent by the May 24, 2011, CSE meeting. Specifically, at that meeting, Parent told the CSE she did not think P.G. was making sufficient progress and was not in an appropriate setting.

Accordingly, Parent could have timely filed her IDEA due process complaint within two years from the May 24, 2011, CSE meeting or resulting IEP, but failed to do so. She is not entitled to any tolling under the specific misrepresentation exception beyond that two-year period.

C.    Withholding of Information Exception

Parent argues "[t]he District's failure to provide the parent procedural safeguards every year, particularly during the years when PG was in severe crisis, in conjunction with the District telling her there was nothing she could do," justifies tolling under the withholding of information exception. (Parent Br. at 23).

The Court disagrees.

"Federal and local regulations require a school district to provide parents with a notice of procedural safeguards on certain specified occasions," and at least "once per year." R.B. ex rel. A.B. v. Dep't of Educ. of City of N.Y., 2011 WL 4375694, at *6 (S.D.N.Y. Sept. 16, 2011) (citing 34 C.F.R. § 300.504; 8 NYRCC § 200.5(f)(3)). The IDEA provides that the statute of limitations for filing a due process complaint "shall not apply to a parent if the parent was prevented from requesting the hearing due to . . . the local educational agency's withholding of information from the parent that was required . . . to be provided to the parent." 20 U.S.C.A. § 1415(f)(3)(D). Thus, the IDEA's two-year statute of limitations must be tolled if a parent did not know of her rights because of a school district's failure to provide procedural safeguard notices. Y.A. v. N.Y. City Dep't of Educ., 2016 WL 5811843, at *8 (S.D.N.Y. Sept. 21, 2016).

Here, Parent knew of her rights no later than August 2012. In particular, in May 2011, Parent engaged the services of Mr. Antonelli and he "educated [her] a little bit about [P.G.]'s rights." (Tr. 1542-43). In June 2012, she consulted with a special education attorney. On August 28, 2012, Parent signed an acknowledgment of receipt of procedural safeguards. (Dist. Ex. 245). Yet she did not file her due process complaint until January 9, 2015, more than two years later.

As a result, the Court agrees with the IHO and SRO that Parent was not prevented from timely filing her due process complaint due to the District withholding information it was required to provide.[2]

---

[2]     Although not raised in Parent's briefs, the Court has also considered the "continuing violation" exception to the statute of limitations, but has determined there are no "compelling circumstances" justifying its application here. See L.K. v. Sewanhaka Cent. High Sch. Dist., 2015 WL 12964663, at *12 (E.D.N.Y. July 16, 2015), aff'd, 641 F. App'x 56 (2d Cir. 2016) (summary order).

IV.    The Parties' Remaining Arguments

Because the Court has determined all of Parent's claims are barred by the applicable statutes of limitations, it need not address the remainder of the arguments raised in the parties' briefs.

**CONCLUSION**

The motion for summary judgment of plaintiff Board of Education of the North Rockland Central School District is GRANTED.

The motion for summary judgment of defendant C.M., individually and on behalf of her child, P.G., is DENIED.

The IHO's decision regarding Parent's Section 504 claim is REVERSED, and the SRO's determination regarding Parent's IDEA claims is AFFIRMED.  In addition, in light of this Opinion and Order, the Court's July 25, 2016, Order (Doc. #38) directing the District to fund P.G.'s programs and services at the Whitney Academy for the 2016-2017 school year is hereby VACATED.

By June 30, 2017, the parties shall submit a joint proposed judgment consistent with this Opinion and Order.  If they cannot agree on a joint proposed judgment, the parties shall submit separate proposed judgments for the Court's consideration.  In addition, if the parties would benefit from a settlement conference before a magistrate judge or Court-appointed mediator, they

shall inform the Court by letter by June 30, 2017, and the Court may refer the case for a

settlement conference or mediation.

      The Clerk is instructed to terminate the motions.  (Docs. ##46, 55).

Dated:  June 19, 2017
       White Plains, NY

                       SO ORDERED:

                       Vincent L. Briccetti
                       United States District Judge